Kennedy, Jennik & Murray, P.C.
Attorneys for Plaintiffs
113 University Place - 7th Floor
New York, New York  10003
(212) 358-1500
Thomas M. Murray (TM 6605)



NOV 2 0 2007

U.S.D.C. S.D. N.Y.
CASHIERS

JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07  CV  10487

------------------------------------------------------------x

LOCAL 215, DISTRICT COUNCIL 1707,
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,

                        **Plaintiffs,**

      -against-

PAUL J. COOPER CENTER FOR HUMAN
SERVICES,

                        **Defendant.**

------------------------------------------------------------x

                     **COMPLAINT**

Plaintiff LOCAL 215, DISTRICT COUNCIL 1707, AMERICAN FEDERATION OF

STATE, COUNTY AND MUNICIPAL EMPLOYEES, by their attorneys, Kennedy, Jennik &

Murray, P.C., allege as follows:

## NATURE OF ACTION

1.      This is an action arising under § 301 of the Labor Management Relations Act, 29

U.S.C. § 185, and § 9 of the Federal Arbitration Act, 9 U.S.C. § 9, to confirm an arbitration

award issued to remedy breaches by defendant of a collective bargaining agreement.

## JURISDICTION AND VENUE

2.      This court has subject matter jurisdiction pursuant to 29 U.S.C. §185 and 28 U.S.C. § 1331.  Venue is appropriate in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred in the district and because the Plaintiff is located here.

## PARTIES

3.      Plaintiff LOCAL 215, DISTRICT COUNCIL 1707, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, (hereinafter referred to as either "the Union" or "the Plaintiff") is a labor organizations as defined by § 2(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(5), and maintains its principal place of business at 75 Varick Street, 14th Fl, New York, NY 10013.

4.      Defendant PAUL J. COOPER CENTER FOR HUMAN SERVICES (hereinafter referred to as either "the Employer" or "the Defendant") is an employer as defined by § 2(2) of the NLRA, 29 U.S.C. § 152(2), and maintains its principal places of business at 519 Rockaway Avenue, Brooklyn, New York 11212.  Defendant is a not-for-profit institution treating developmentally challenged clients in residential site settings.

## FIRST CAUSE OF ACTION

5.      At all times material hereto the Union was the designated collective bargaining representative of an appropriate bargaining unit of the Employer's employees.

6.      At all times material hereto a collective bargaining agreement (hereinafter referred to at "the labor contract" and attached hereto as Exhibit A) was in effect between the Union and the Employer.

2

7.      The labor contract, in Article XXI, provides for the arbitration of disputes, including disputes concerning the discharge of employees without just cause.

8.      On or around February 23, 2006, a dispute arose between the Union and the Employer concerning the Employer's decision to terminate a bargaining-unit employee without just cause.

9.      The Union filed a timely grievance which was processed through the steps of the grievance procedure.

10.     The grievance was submitted to arbitration with the American Arbitration Association (Case Number 13 300 01546 06).

11.     On November 16, 2006, an arbitration hearing was conducted before arbitrator David L. Gregory at the offices of Kennedy, Jennik & Murray, P.C., located at 113 University Place.  The hearing was adjourned and reconvened at the same location on November 29, 2006.

12.     At the outset of the arbitration hearing, the Union and the Employer stipulated that the grievance was arbitrable, timely and properly before arbitrator Gregory.

13.     On December 3, 2006, arbitrator Gregory issued an Opinion and Award (attached hereto as Exhibit B), in which he upheld the Union's grievance and ordered that the grievant be reinstated and made whole for all lost wages.

14.     The Employer has not complied with arbitrator Gregory's Opinion and Award and has refused to pay the back pay owed to the grievant.

15.     Plaintiffs are therefore entitled to a judgment confirming the arbitrator Gregory's Opinion and Award and directing Defendant to pay the back pay owed to grievant.

WHEREFORE, Plaintiffs demand judgment:

1.    Confirming the arbitration award of arbitrator David L. Gregory dated

December 3, 2006, and directing that judgment be entered thereon in this Court;

2.    Awarding prejudgment interest at the rate of 9% for all monetary relief;

3.    Awarding plaintiffs' attorney's fees and costs; and

4.    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 13, 2007

KENNEDY, JENNIK & MURRAY, P.C.
Attorneys for Plaintiffs

By: _Thomas M. Murray_
     Thomas M. Murray, P.C.
     113 University Place, 7th Floor
     New York, New York 10003
     (212) 358-1500

# EXHIBIT A

AGREEMENT

BETWEEN

PAUL J. COOPER CENTER FOR HUMAN SERVICES

AND

COMMUNITY AND SOCIAL AGENCY EMPLOYEES UNION

DISTRICT COUNCIL 1707, LOCAL 215, AFSCME, AFL-CIO

JULY 1, 2001-JUNE 30, 2003

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **ARTICLE I** | The Collective Bargaining Unit | 3 |
| **ARTICLE II** | Union Security | 4 |
| **ARTICLE III** | Hiring and Employment | 4 |
| **ARTICLE IV** | Probationary Period | 6 |
| **ARTICLE V** | Seniority | 6 |
| **ARTICLE VI** | Promotions and Filling New Positions | 7 |
| **ARTICLE VII** | Absences and Leaves Other Than Sick Leave | 8 |
| **ARTICLE VIII** | Conference Attendance by Professionals | 9 |
| **ARTICLE IX** | Management Rights | 9 |
| **ARTICLE X** | Layoffs | 9 |
| **ARTICLE XI** | Discharge and Disciplinary | 10 |
| **ARTICLE XII** | Wages | 10 |
| **ARTICLE XIII** | Overtime | 11 |
| **ARTICLE XIV** | Workweek | 11 |
| **ARTICLE XV** | Holidays | 11 |
| **ARTICLE XVI** | Vacations | 12 |
| **ARTICLE XVII** | Sick Leave | 13 |
| **ARTICLE XVIII** | Leave Reports | 14 |
| **ARTICLE XIX** | Union Activity | 14 |
| **ARTICLE XX** | Welfare Benefits | 15 |
| **ARTICLE XXI** | Grievance and Arbitration Procedure | 15 |
| **ARTICLE XXII** | No Strike or Lockout | 16 |
| **ARTICLE XXIII** | Labor Management Committee | 17 |
| **ARTICLE XXIV** | Effect or Legislation-Separability | 17 |
| **ARTICLE XXV** | Duration | 17 |

Agreement entered into as of the 27th day of December 2001 by and between Paul J. Cooper Center for Human Services, Inc., 519 Rockaway Avenue, Brooklyn, NY 11212 (hereinafter referred to as the "Employer" or the "Agency") and Community & Social Agency Employees Union, District Council 1707, Local 215, AFSCME, AFL-CIO, thereof, 75 Varick Street, New York, NY 10013 (hereinafter jointly referred to as the "Union").

## WITNESSETH:

WHEREAS the parties have negotiated an Agreement effective for the period July 1, 2001 to and including June 30, 2003.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises hereinafter contained, the parties hereto do hereby agree as follows:

## ARTICLE I

## THE COLLECTIVE BARGAINING UNIT

The Employer recognizes the Union as the exclusive collective-bargaining representative of the Employees in the following units:

### Professional Unit

**Included:**   All full-time and regular part-time professional Employees including Jr. Accountants, Registered Nurses, Psychologists, Social Workers (CSW) and Psychiatric Social Worker (PSW) employed by the Employer at its facilities located at 106 New Lots Avenue, 250 Utica Avenue, 235 Jerome Street, 272 Pennsylvania Avenue, 882 Saratoga Avenue, 129 East 96th Street, and 519 Rockaway Avenue, Brooklyn, New York.

**Excluded:**   All non-professional Employees, Physicians, Psychiatrist P/T, guards and supervisors as defined in this Article.

### Non-Professional Unit

**Included:**   All full-time and regular part-time non-professional Employees including Clerk Typists, Counselors, Recreational Therapists, Cook/Coordinators, Housekeepers, Maintenance Workers, Alcoholism Counselors, Receptionists, Billing Clerks, Mental Health Workers, Bookkeepers, and Secretaries employed by the Employer at its facilities located at 106 New Lots Avenue, 250 Utica Avenue, 235 Jerome Street, 272 Pennsylvania Avenue, 882 Saratoga Avenue, 129 East 96th Street, and 519 Rockaway Avenue, Brooklyn, New York, AND 329 Vernon Avenue, Brooklyn.

3

**Excluded:** All other Employees including professional Employees, Administrative Secretaries, Secretary to the Clinical Director, guards and supervisors as defined in this Article.

## ARTICLE II

### UNION SECURITY

A.    The Employer recognizes the Union as the sole and exclusive bargaining representative of the bargaining units as defined in Article I.

B.    The Employer shall not discriminate against or favor any Employee or prospective Employee in the bargaining unit on account of membership in the Union or on account of Union activity.

C.    As of the effective date of this contract, all Employees who have or shall accrue thirty (30) days of employment shall as a condition of employment be members of the Union and remain in good standing or in the alternative, tender an Agency or service fee as Union members, but not be subject to any special assessments. In lieu of an initiation fee, Employees hired after November 1, 1987 choosing to remit an agency or service fee will tender to the Union an initial special Agency fee equal to the amount of the Union's initiation fee. An Employee shall be considered a member in good standing of the Union if the Employee tenders the appropriate initiation fee and regularly pays dues required by the Union as a condition of membership.

D.    The Employer shall deduct initiation fees and dues pursuant to District Council 1707 dues schedule from the wages and/or salaries of Employees who sign individual authorization for such deductions and the Agency will transmit such deductions to the Union on a monthly basis or the Employer shall deduct Agency or service fees in a similar manner.

E.    No Employee shall be asked to sign an individual contract, which shall conflict with this Agreement.

## ARTICLE III

### HIRING AND EMPLOYMENT

A.    New Employees covered by this Agreement shall be informed in writing at the time of hiring of the positions for which they are hired, their salaries and whether they are hired on a temporary or regular basis. This information shall also simultaneously be provided to the Chapter Chair. Such new Employees shall be informed by the Employer that the Community and Social Agency Employees' Union, District Council 1707, AFSCME, AFL-CIO, is the sole collective bargaining agent for the employees in the bargaining unit. Such new Employees shall be given a copy of this Agreement within thirty (30) days of hiring. The Employer shall distribute said copies of

4

the Agreement, but it is agreed that the Union shall provide said copies to the Employer for distribution.

B. Employees may be hired on a temporary basis. Temporary Employees are those engaged with understanding that their employment is for a limited period not to exceed six (6) months. Employees retained beyond the end of temporary employment shall become regular Employees. Should circumstances warrant the necessity to continue a temporary Employee beyond the six (6) month period, but not require the Employee's conversion to permanent status, then the Employer maintains the right to a one-time extension of the six (6) month period, for an additional six (6) months. The Union retains the right to challenge the reasonableness of the circumstances via the grievance procedure.

C. If a temporary Employee acquires regular status, the period of temporary employment shall apply towards his/her probationary period, and the seniority of such Employee shall be retroactive to the date of original employment.

D. Temporary Employees may be discharged at the will of the Employer during or at the end of their period of temporary employment, which discharge shall not be subject to the grievance machinery. Temporary Employees who have been employed for a period of three (3) months or more shall be given one week's notice of such discharge, or one week's pay in lieu thereof, which notice may be given during the period of temporary employment or at the end thereof, if such notice is given at the end of the period of temporary employment, it shall not be denied to extend the period of employment, so as to make the Employee a regular Employee as provided in Section A of this Article. Temporary Employees will be entitled to benefits under this Agreement when and only when they are converted to permanent Employees.

E. Six (6) months prior to the expiration date of this Agreement, the Employer will furnish the Union with a list containing the following information for all Employees covered by this Agreement: name, address, date of hire, classification, and job title, whether temporary or permanent, location at which employed and salary. Salary shall be specified at the full time rate in the same terms, e.g., per week or per year.

F. Within thirty (30) days after the hiring of a new Employee, the Employer will furnish the Union and the Chapter Chair in writing with the data specified in Section E of this Article.

G. The Employer agrees to notify the Union in writing monthly, of the following changes in Employee status by name, effective date and type of change in classifications, salaries, resignations, retirements and discharges.

H. If a long term Vacation Relief worker, who meets the qualifications, applies for a position, they shall be given first preference. Training is necessary for the health and safety of both consumers and staff.

## ARTICLE IV

## PROBATIONARY PERIOD

A.    All new hire regular Employees shall be required to serve a probationary period, during or at the end of which period the Employee may be discharged at the will of the Employer at any time, and which discharge shall not be subject to the grievance machinery. During the probationary period none of the provisions of this Agreement shall apply to the Employee except as specifically provided in Section C of this Article, and except those provisions relating to hours and wages scales and except as specifically otherwise provided herein. All members of the Professional Unit shall serve a probationary period of ninety (90) days. The probationary Employee must be given a written evaluation midway of their probationary period. The Employer may extend for a period of thirty (30) days any Employees probation. Such extension shall be allowed only once. The extension shall be in writing. Notice of the extension shall be provided to the Employee and the Union and the Chapter Chair within two (2) weeks of the end of the Employee's probationary period.

B.    Upon satisfactory completion of the probationary period, the seniority of the probationary Employee shall be retroactive to the date of original employment.

C.    During the probationary period, Employees on probation shall be paid for holidays scheduled on their regularly scheduled workday when they have worked the scheduled work day before and after said holiday, unless otherwise excused. Employees on probation shall otherwise be entitled to receive no other benefits until they satisfactorily completed their probationary period.

## ARTICLE V

## SENIORITY

A.    Seniority is the amount of continuous employment calculated from the most recent hiring date. In cases of layoffs seniority shall be determinative of those retained in any one category. Seniority shall not be considered interrupted by vacations or sick leave, but shall not be accrued during maternity leaves or study leaves, or other extended leaves granted on a discretionary basis.

B.    The term "category" shall be deemed to refer to the various job classifications in the Agency; however, Employees about to be laid off shall be permitted to bump into job classifications carrying the same rate range if they have had reasonable experience in the job and have the ability to do the work.

C.    In the event of a layoff of any Employee, there shall occur only one "bump", hence avoiding a domino effect. An Employee who is bumped shall himself/herself have no bumping rights. An Employee who bumps into another job classification shall be required to serve a probationary period in the job into which he/she bumps. Any Employee who bumps down into a position in which he/she has

6

already satisfactorily served a probationary period will not be required to serve the probationary period again.

# ARTICLE VI

## PROMOTIONS AND FILLING NEW POSITIONS

A.    Notice of vacancies within the bargaining unit shall be posted on bulletin board at least ten (10) days before vacancy is filled.

B.    All Employees have the right to apply for any and all vacant positions and their applications shall be handled in accordance with the Employer's hiring procedure. The Employer does agree to notify all candidates of a decision with respect to said vacancies once said decision has been made by the Employer.

C.    Advancement is dependent upon successful performance in the position held and fitness for new job. In a promotion within the bargaining unit, if current Employee is to be promoted, length of service in the present position shall be determinative where qualifications and competence are substantially the same.

D.    When an Employee take over the duties, in whole or in major part of a higher category, which duties requires greater skills or involve greater responsibility than the Employee's regular job for a period of fifteen (15) days or more, the Employee shall be paid for the entire period at the rate of the incumbent or former Employee, subject to the approval of the Employer's funding sources.

E.    A promoted Employee shall be required to serve the probationary period in the new position. If he/she is found unsatisfactory in the new position, he/she may be restored to his/her former position with no loss of seniority or other benefits.

F.    Upon promotion to a job of a higher category, an Employee shall be paid the incumbent or former incumbent's salary for the job, subject to the approval of the Employer's funding sources.

G.    An Employee shall be provided with two (2) weeks written notice of their transfer to another facility. Such notice of transfer will be provided to the Chapter Chair and the Shop Steward.

H.    Tuition reimbursement shall be paid at three hundred dollars ($300.00) per semester for books. Must provide proper documentation (valid receipt).

# ARTICLE VII

## ABSENCES AND LEAVES OTHER THAN SICK LEAVE

**Bereavement:** Leave with pay up to five (5) working days shall be granted by the Agency in case of death in the immediate family of the Employee. The term "Immediate family" shall be limited to the parent(s), spouse, domestic partner, children, or sibling(s) of the Employee.

Leave shall be paid for each occurrence and shall not be limited to one occurrence per year.

**Disability and Parental Leave:** Employees with one (1) or more years of continuous service shall be granted disability and/or parental leave of up to one year, without. Longer leaves may be granted at the discretion of the Employer. Employees may elect to take leave in accordance with the provisions of The Family and Medical Leave Act ("FMLA"). Such leave shall include regular vacation and sick leave with pay earned prior to such leave.

**Study Leave:** For professional advance may be granted without pay at the discretion of the Agency.

**Leave Without Pay:** Shall be granted an Employee designated as a representative of the Union at a convention of New York State Federation of Labor or of the American Federation of State, County and Municipal Employees, generally five (5) working days. The Employer retains the right to grant said leave subject to the needs of the Employer and subject to the Employee requesting said leave after having notified the Employer of the need for the leave at least one week in advance of the first day of the requested leave.

**Leave of Absence:** The Agency will give consideration to applications for leaves of absence without pay for personal reasons not specified herein. Employees who leave the Agency on a leave of absence granted in accordance with the provisions of this Article shall not accrue any vacation or sick time prorated for the period they are on said leave of absence.

**Medical Care:** Employees who require emergency medical care during working hours or who have medical appointments, which could not have been scheduled except during working hours shall be allowed time off for these purposes through arrangements with their supervisors. Such time off shall be charged against sick leave.

**Jury Duty:** Employees on jury duty will receive their regular pay for one (1) week. Thereafter, at the discretion of the Executive Director.

## ARTICLE VIII

## CONFERENCE ATTENDEANCE BY PROFESSIONALS

A.    In the discretion of the Agency, the selection of professional Employees to attend such conference shall be vested exclusively in the Agency, which shall, however, take into consideration, in addition to all other relevant factors, the wishes of the staff and the desirability of spreading conference participation among the largest number able to profit there from. Employees attending conferences may be required to render reports thereon.

## ARTICLE IX

## MANAGEMENT RIGHTS

A.    Except as otherwise provided in this Agreement, the Employer retains the exclusive right to hire, direct and schedule the working force, to plan, direct and to control operations; to discontinue, or reorganize or combine any Department of Facility or Branch of operations with any consequent reduction or other changes in the working force; to hire and layoff employees; to promulgate rules and regulations; to introduce new or improved methods or facilities regardless of whether or not the same cause a reduction in the working force and in all respect to carry out, in addition, the ordinary and customary fictions of management. Notwithstanding anything in this Agreement to the contrary, but subject to the next following sentence of this paragraph and paragraph D of Article VI hereof, the Employer units discretion, and in any event in the case of emergencies, can direct and schedule the working force or any employee in any classification to perform the work ordinarily done by the Employees in a different classification, provided no special license is required to perform such other work. None of these rights shall be exercised in a capricious or arbitrary manner.

B.    The Union, on behalf of the Employees, agrees to cooperate with the Employer to attain and maintain full efficiency and maximum care for the clientele and patients of the Employer and the Employer agrees to receive and consider constructive suggestions submitted by the Union toward these objectives.

## ARTICLE X

## LAYOFFS

A.    Any Employee separated from employment with the Employer, as the result of an economic layoff shall be placed on a list for rehiring in the job category in which he/she was employed at the time of layoff. Before any new Employee may be hired in that category, all laid-off Employees on the rehiring lest for that category shall be offered re-employment in the inverse order to that in which they were laid-off. Employees will be kept on the rehiring list for one (1) year. **The Employer shall mail**

to the Employee at his/her last known address job notices. A copy of the notice shall be sent to the Union at the same time it is sent to the Employee.

## ARTICLE XI

## DISCHARGE AND DISCIPLINARY ACTION

A.    The Employer shall have the right to discharge, suspend or discipline any Employee for cause. If the Union desires to contest the discharge, suspension or other disciplinary action, it shall give written notice thereof to the Employer within ten (10) working days by filing a grievance in accordance with Article XXI-Grievance and Arbitration Procedure.

B.    **The following shall be cause for immediate discharge:** The failure to abide by Federal, State, City or Employer policy, procedures or regulations; either verbal or physical abuse of patients, clientele or Employees; violation of any criminal or penal statue or enactment; participation in an unauthorized strike; repeated failure, without satisfactory excuse, to report for work not in accordance with work schedule; stealing; reporting for work while intoxicated; drinking intoxicants on Employer property/premises; insubordination; and, without construing the foregoing as words of limitation, any other similar act.

C.    The Employer will forward a copy of all disciplinary actions to the Union.

## ARTICLE XII

## WAGES

A.    There shall be a 3.5% salary increase on the base salary, retroactive to July 1, 2001.

B.    There shall be a 3.5% salary increase on the base salary, effective July 1, 2002.

C.    Longevity: Effective July 1, 1999, Employees who have completed ten (10) full years, or more, of service with the Agency shall receive a one-time longevity bonus of $1,000.00.

D.    Consumer Vacation: Effective July 1, 1999, Employees who take Consumers on vacation will be paid at a daily rate of eight (8) hours regular pay, and eight (8) hours at time and a half (1½).

E.    Drivers: There shall be a $1,000.00 differential for residential counselors who drive the vans on a regular and consistent basis. This differential will be pro-rated for counselors who drive for thirty (30) days or more.

F.    401(k): The Agency will match up to three (3%) percent contribution into Mutual Of America Life Insurance Company's 401(k) plan.

## ARTICLE XIII

### OVERTIME

A.    With respect to work performed in excess of forty (40) hours the Employer will compensate employees in accordance with the provisions of the Fair Labor Standards Act (FLSA).

B.    A seniority list must be posted at each and every site of the Agency. Overtime shall be offered to the most senior worker first, and then down the list until someone of more seniority volunteers. If no one volunteers, management can assign the least senior (in case of hardship, the next least senior).

## ARTICLE XIV

### WORKWEEK

A.    The workweek for the Headquarters staff shall be Monday through Friday with Saturday and Sunday off.

B.    Workers in Residences shall be scheduled to work five (5) consecutive days with the sixth (6th) and seventh (7th) day immediately following to be days off.

## ARTICLE XV

### HOLIDAYS

A.    Employees are granted eleven (11) full and two (2) half-days of paid holiday time. This provision covers all employees except those who work in the residence programs where full staff coverage is a twenty-four (24) hour responsibility, seven (7) days a week. Employees working designated holidays in the group residences shall be paid time and one-half for each hour worked.

B.    Paid holidays which fall on a Saturday will observed on the preceding Friday. Paid holidays which fall on a Sunday will observed on the following Monday.

C.    When a legal holiday specified in this Agreement falls during, an Employee's vacation, the Employee shall receive an additional day of vacation with pay for each such holiday.

11

D.    In the case of a full time Employee who works a five (5) day week, if a legal holiday specified in this Agreement falls on the Employee's regular day off, the Employee shall be given an addition day off with pay at a time requested by the Employee and approved by the agency, which approval shall not be unreasonably withheld.

E.    Holidays recognized by Agency policy are as follows:

New Years Day
Martin Luther King Day
Lincoln's Birthday
Washington's Birthday
Good Friday (1/2 day)
Memorial Day
Independence Day
Labor Day
Columbus Day
Veterans Day
Election Day (1/2 day)
Thanksgiving Day
Christmas Day

## ARTICLE XVI

## VACATIONS

A.    All full-time Employees with an appointment date on or before July 1, 1991 shall be entitled to annual vacation at an accrual rate of one and two-thirds (1 2/3) days per month of service for a maximum of twenty (20) working days per year.

B.    Vacation allowances for Employees hired on or after August 1, 1991 shall be:

| Years In Service | Annul Vacation Allowance | Monthly Accruals |
|---|---|---|
| Beginning Employee's 1st year | 10 working days | (Non-Professionals) 1 day per month after the first two (2) months.<br><br>(Professionals) 1 day per month after first three (3) months. On the 15th day of 12th month, they shall accrue 2 days. |
| 2nd year | 13 working days | 1 day per month plus 1 additional day at the |

| | | end of second year. |
|---|---|---|
| 3rd year | 13 working days | 1 day per month plus 1 additional day at the end of third year. |
| 4th year | 15 working days | 1.25 days per month. |
| 5th year | 20 working days | 1 2/3 days per month. |

C.     Part-time Employees will receive a prorated allocation of vacation days based on the hours of service per month compared to the normal complement of hours of service provided by full-time Employees.

D.     All Employees shall file formal written vacation requests with the Employer by April of each year for that year's vacation usage. Management shall approve or disapprove no later than May 1st. The needs of the Employer and the Employee's seniority shall be the factors taken into consideration when conflicts with respect to vacation choices exist.

E.     Vacation schedules shall be established taking into account the wishes of the employees and the needs of the Employer.

F.     Vacations shall be granted between June 1st and September 30th, or on occasion at another time mutually agreeable between the Employer and the Employee.

G.     No part of an Employee's scheduled vacation may be charged to sick leave. Employees shall be allowed to carry over up to three (3) weeks. Employees will not be compensated for vacation time not taken.

H.     Vacation pay shall be based upon the Employee's regular pay.

I.     New Employees will not be given credit for any vacation accrual until the satisfactory completion of their probationary period, at which time they will be credited with the probationary period in computing their annual vacation.

J.     Employees who request in writing at least two (2) weeks before shall receive their vacation pay in advance, if economically feasible.

## ARTICLE XVII

## SICK LEAVE

A.     Full-time Employees shall be entitled to paid sick leave earned at the rate of one (1) day for each month of employment, up to a maximum of twelve (12) days per year.

B.    Part-time Employees will receive a prorated allocation of sick days based on the hours of service per month compared to the normal complement of hours of service provided by full-time Employees.

C.    To be eligible for benefits under this Article, an Employee who is absent due to illness or injury must notify his/her supervisor at least (4) hours before the start of his/her regularly scheduled tour of duty. Unless proper excuse is presented for the Employee's inability to call, the Employer may require proof of illness hereunder.

D.    Absence of three (3) consecutive days on sick leave must be justified by a letter from the Employee's physician.

E.    Pay for one day of sick leave shall be at the Employee's regular pay.

F.    If an Employee resigns or is dismissed or laid off and has exceeded his/her allowable sick leave, the excess sick leave paid shall be deducted from any moneys due him/her from the Employer at the time of resignation, layoff or dismissal.

G.    If a holiday falls during an Employee's sick leave no deduction from sick leave shall be made for that day.

## ARTICLE XVIII

## LEAVE REPORTS

A.    A quarterly statement will be available from management outlining an Employee's balance of accrued sick leave and vacation. This statement shall be given to Employees by the 15th of the month following the end of the quarter.

B.    Employees will accrue sick and vacation leave on the 15th of the month following their date of hire.

C.    All programs of the Employer shall use the same method for recording and reporting time accruals. Employees shall be given copies of their time sheets every two (2) weeks.

## ARTICLE XIX

## UNION ACTIVITY

A.    The Agency shall make available bulletin board space in such locations or area as shall be designated by the Agency, which shall be used exclusively for the purposes of posting notices of interest to the Union.

B.    The Union shall be represented by a Steward in each location and c Chapter Chairperson. The location Steward and Chapter Chairperson is authorized to act on behalf of individuals in grievances.

C.    The Agency shall make deductions from payroll and remit such money to the District Council 1707 Credit Union and P.E.O.P.L.E. on behalf of each Employee who files a signed written authorization for such deduction with the Agency.

## ARTICLE XX

### WELFARE BENEFITS

A.    Subject to the approval of the Employer's funding sources, the Employer agrees to participate in Health Plan of Greater New York on behalf of its Employees. Participation in the HIP shall provide there under for the Health, Hospitalization, Major Medical, Dental and Optical Insurance. The Employer's obligation to provide such coverage shall be described as follows:

(1)    The Employer shall contribute 93.5% of the cost of premiums for individual or family coverage under HIP for all members of the bargaining unit.

(2)    The Agency will provide on behalf of such Employees, Hospitalization, Basic and Major Medical Benefits, Dental Program, Optical Program and Life Insurance, no less than as described in the current Summary Plan Description of the Fund, which summary shall be part of this labor contract.

## ARTICLE XXI

### GRIEVANCE AND ARBITRATION PROCEDURE

A.    A grievance shall be defined as a dispute or complaint arising between the parties hereto under or out of this Agreement or the interpretation, application, performance, termination or any alleged breach thereof, and shall be processed and disposed of in the following manner:

Step 1: Within ten (10) days after discovery of circumstances giving rise to a grievance, said grievance must be filed by a Steward or Union Representative with the Program Director unless the grievance was precipitated by action emanating from a management level higher than the immediate supervisor. In that case, the grievance should be filed directly at Step 2, which is with the Executive Director. The Employer shall give its answer to the grievance after ten (10) days unless extended by mutual agreement. If the decision is not handed down within the prescribed time the grievance shall be deemed denied and the Union may proceed to the next step.

Step 2: Within ten (10) days after the decision at Step 1 is handed down, a grievance must be filed with the Executive Director or the matter shall be deemed closed

after ten (10) days unless extended by mutual agreement. If the decision is not handed down within the prescribed time the grievance shall be deemed denied and the Union may proceed to the next step.

Step 3: Within ten (10) days after the decision at Step 2 is handed down, a grievance must be filed with the Board of Directors or the matter shall be deemed closed with prejudice. The Board of Directors shall make every effort, in conjunction with the Union to find a mutually convenient date and time to hear the grievance with a target date of ten (10) days. The Board shall make its findings after a hearing within ten (10) days. If the decision is not handed down within the prescribed time the grievance shall be deemed denied and the Union may proceed to the next step.

B.    All grievances must be reduced to written form.

C.    Any disposition of a grievance from which no appeal is taken within the time limits specified herein shall be deemed resolved and shall not thereafter be considered subject to the grievance and arbitration provisions of this Agreement.

D.    A grievance as defined within this Article, which has not been resolved hereunder may, within fifteen (15) days after the completion of Step 3 of the grievance procedure, be referred for arbitration by the Employer or the Union to an Arbitrator selected in accordance with the procedures of the American Arbitration Rules then prevailing at the American Arbitration Association. The fees and expenses of the American Arbitration Association and the Arbitrator shall be borne equally by the Employer and the Union.

E.    The Arbitrator shall have jurisdiction only over disputes arising out of grievances, as defined at the beginning of this Article, and the Arbitrator shall have no power to add to, subtract from, or modify in any way any of the terms of this Agreement. Subject to conformity with this proviso, the award of an Arbitrator hereunder shall be final, conclusive and binding upon the Employer, the Union and the Employee(s).

## ARTICLE XXII

## NO STRIKE OR LOCKOUT

A.    No Employee shall engage in any strike, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer.

B.    The Union, its officers, agents, representatives and members, shall not in any way directly or indirectly, authorize, assist, encourage, participate in or sanction any strike, sit-down, cessation or interruption of work, boycott, or other interference with the operations of the Employer or ratify, condone or lend support to any such conduct or action.

C.    The Employer agrees that it will not lock out Employees during the term of this Agreement.

## ARTICLE XXIII

## LABOR MANAGEMENT COMMITTEE

There shall be established a joint labor/management committee to meet and discuss issues concerning difficult clients and how best to train staff on handling said clients. The committee shall begin meeting within four (4) weeks following the ratification of this Agreement. The committee shall make its recommendations to the Executive Director within twelve (12) weeks after this Agreement is ratified by the parties. Each party shall appoint two (2) members to the committee.

A committee shall also be established to consider and recommend a particular type and/or provider for the Employees pension benefits.

## ARTICLE XXIV

## EFFECT OR LEGISLATION-SEPARABILITY

A.    It is understood and agreed that all Agreements herein are subject to all applicable laws now or hereafter in effect; and to the lawful regulations, rulings and orders of regulatory commissions or agencies having jurisdiction. If any provision of this Agreement is in contravention of the laws or regulations of the United States or of the State of New York or City of New York, such provision shall be superseded by the appropriate provision of such law or regulation, so long as same is in force and effect; but all other provisions of this Agreement shall continue in full force and effect.

## ARTICLE XXV

## Duration

A.    This Agreement shall become effective as of July 1, 2001, and shall remain in effect for a period of two (2) years.

B.    It shall thereafter automatically continue until the Agency or the Union gives the other sixty (60) days written notice by certified mail of its desire to modify or terminate this Agreement.

C.    When changes in the Agreement are proposed and subsequently agreed upon, they shall be reduced to writing and signed by both parties.

D.    The Collective Bargaining Agreement shall be effective for two (2) years up to and including June 30, 2003.

E.    Notwithstanding the above, the Agency or the Union within six (6) months may reopen Article XII, only for the purpose of (1) distributing anticipated monies from the Agency's funding source upon receipt of said monies (2) discussion of implementing longevity increases to the base salaries of the Employees.


**Paul J. Cooper Center
For Human Services, Inc.**

_____
**Wayne C. Wiltshire
Chief Executive Officer**


**District Council 1707
Local 215 AFSCME AFL-CIO**

_____
**Caryn L. Morgan
Staff Representative**

_____
**Albert Jenkins
Chapter Chair**


Date: __4|5|02__


Date: __4|5|02__


18

## MEMORANDUM OF AGREEEMENT

Between

Paul J. Cooper Center for Human Services
And
Community And Social Agency Employees Union
District Council 1707, Local 215, AFSCME, AFL-CIO

WHEREAS, the collective bargaining agreement ("CBA") between the above parties expired by its terms on June 30, 2003; and

WHEREAS, the parties are desirous of extending the CBA;

NOW THEREFORE in consideration of the mutual promises, covenants and provisions herein contained, it is agreed:

That all of the terms and conditions of the CBA are extended through and including June 30, 2004.

Dated: May 25, 2004

Paul J. Cooper Center For Human Services, Inc.

By: _____

District Council 1707 Local 215 AFSCME AFL-CIO

By: _____

# MEMORANDUM OF AGREEEMENT

Between

Paul J. Cooper Center for Human Services
And
Community And Social Agency Employees Union
District Council 1707, Local 215, AFSCME, AFL-CIO

WHEREAS, the collective bargaining agreement ("CBA") between the above parties expired by its terms on June 30, 2005; and

WHEREAS, the parties are desirous of amending the CBA;

NOW THEREFORE in consideration of the mutual promises, covenants and provisions herein contained, it is agreed:

1. That all of the terms and conditions of the CBA are extended through and including June 30, 2006, excepts as provided herein.

2. That employees in the collective bargaining unit receive a wage adjustment retroactive to January 1 2006 of three (3%) percent, provided they have met the minimum requirements for their position. Employees who subsequently meet the minimum requirements for their position shall receive the increase upon presentation of proof of same.

3. Accrued Leave

All accrued leave (vacation, holiday and personal) balances are to be reduced to no more than fifteen (15) days as of January 31, 2006. In accordance with the CBA, an employee is permitted to carry-over no more than fifteen (15) accrued leave days to the next fiscal year (July –June).

However, employees with large leave balances as outlined below, shall have additional time to exhaust their accrued leave balances as follows:

An employee with accruals of 75 days or more, have until ~~December 31, 2007~~ June 30, 2008 to comply with this policy.

An employee with accruals of 50 to 74 days, have until ~~June 30, 2007~~ Dec. 31, 2007 to comply

with this policy.

An employee with accruals of 49 or less days, have until ~~December 31, 2006~~ June 30, 2007 to comply with this policy.

Any Employee who because of the needs of the Employer, is denied vacation requests three (3) times pursuant to this reduction of accrual leave policy, shall be entitled to one (1) three (3) month extension and during this extension period, the vacation request of the employee shall be approved.

Effective May 29, 2006, if a holiday falls on an Employee's pass day, the Employee will be paid regular time for the holiday and the holiday will not be accrued.

Accrued leave balances that exceed fifteen (15) days as of December 31, 2007 will be loss.

4. As soon as the Employer learns of a change or transfer of ownership, operation, or control and of any merger, consolidation or affiliation of the Center, the Employer shall give notice to the Union.

5. The Center will forward a copy of all disciplinary actions to the Union (District Council 1707 Representative and Chapter Chair)

6. Employees who are terminated shall have an exit interview. At the interview, an employee's rights and benefits will be explained.

7. Management shall develop a new vacation request form and respond to all requests in writing no later than May 1st.

8. Article V1 H. shall be amended to provide for "job related courses".

9. Article 1V shall be amended to provide for a 60 day probationary period for regular Employees.

10. On written notice from an Employee that time is needed off to renew a job related credential, the Employer will make reasonable accommodations for the employee to take time off to renew a job related credential.

This MEMORANDUM OF AGREEEMENT must be agreed to by the members of District Council 1707, Local 215 and the Board of Directors of Paul J. Cooper Center For Human Services.

Agreed to this 11th day of May 2006

Paul J. Cooper Center For Human Services, Inc.

By: _____ 12/7/06

District Council 1707 Local 215 AFSCME AFL-CIO

By: _____ 12-8-06

_____ 12/8/06

Luz I. Santiago

12/7/06

# Memorandum of Agreement
## Between
### Paul J. Cooper Center for Human Services
### And
### CSAE, DC 1707, Local 215

The Employer shall provide all bargaining unit Employees with a salary increase 2.8% retroactive to July 1, 2006.

The Employer will make every reasonable effort to implement this increase by the upcoming payroll.

For DC 1707, Local 215

Ann Marie Lunetta

Gilbert Jenkins

For Paul J. Cooper

John Lewis Brown

December 7, 2006

# EXHIBIT B

American Arbitration Association
Case 13 300 01546 06

In the Matter of the Arbitration Between:

LOCAL 215, DISTRICT COUNCIL 1707, AFSCME
(Grievant Crystal Albert)

And

THE PAUL J. COOPER CENTER FOR HUMAN SERVICES

Arbitrator David L. Gregory
Decision of December 3, 2006

# INTRODUCTION

This arbitration, American Arbitration Association Case No. 13 300 01546 06, involves the grievance brought by Local 215, District Council 1707, AFSCME, 75 Varick Street, New York, New York 10013 (the Union). The grievance protests the Paul J. Cooper Center for Human Services', 519 Rockaway Avenue, Brooklyn, New York 11212, 718.498.5555, fax 718.498.6868  (the Employer) February 23, 2006[1] discharge of Ms. Crystal Albert (the Grievant) for "job abandonment." (Joint Exhibit 2)

I am the Arbitrator selected by the parties through the auspices of the American Arbitration Association. The parties expressly stipulated at the commencement of the arbitration hearing that the grievance is arbitrable and is timely and properly before me.

The arbitration hearing occurred as scheduled on November 16 and November 29, 2006 at the law offices of the law firm representing the Union, Kennedy Jennik & Murray, PC,  113 University Place, New York, New York 10003.

The parties were very well represented by counsel, presented evidence through exhibits and sworn witness testimony, and examined and cross-examined witnesses. Human Resources Director Teresa Stewart, and Residence Manager and the Grievant's immediate supervisor, Ms. Marjorie Robertson, testified for the Employer. The Grievant testified for the Grievant and the Union.

---

[1] All dates referred to herein are in 2006, unless otherwise noted.

The hearing was not transcribed. The parties presented oral closing arguments at the conclusion of the second day of the arbitration hearing on November 29, and they expressly waived their right to file post hearing briefs.

I have carefully read and studied the entire record, including the testimony of the witnesses and all of the exhibits—including the many labor arbitration decisions (Union Exhibits 10-17) provided, cited, and elucidated by the Union during the Union's closing oral argument. I render this binding decision pursuant to law, the parties' collective bargaining agreement, and the rules of the American Arbitration Association.

**APPEARANCES**

The Union is represented by Mr. Christopher G. Gant, Esq., Kennedy Jennik & Murray, 113 University Place, New York, New York 10003; 212.358.1000; fax 212.358.0207; cgant@ksclaborlawyers.com   Mr. R. Solis, Union Staff Representative, was also present for the Union. The Grievant was present throughout.

The Employer is represented by Mr. Epifanio Castillo, Jr., Esq., 2718 Seymour Avenue, 2nd Floor, Bronx, New York 10469-5524; 646.281.5504; fax 718.654.5046; casllp2@aol.com., of counsel to Maher & Brown, 20th Floor, 14 Wall Street, New York,

New York 10005.  Human Resources Director Teresa Stewart and Residence Manager Marjorie Robertson were also present for the Employer.

**THE ISSUE**

The parties stipulated the Issue: Was the Grievant discharged for cause? If not, what shall be the remedy?

**THE RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT (Joint Exhibit 1)**

<u>**ARTICLE XI**</u>

**DISCHARGE AND DISCIPLINARY ACTION**

A. The Employer shall have the right to discharge, suspend or discipline any Employee for cause. …

B. **The following shall be cause for immediate discharge:** The failure to abide by Federal, State, City or Employer policy, procedures or regulations; either verbal or physical abuse of patients, clientele or Employees; violation of any criminal or penal statue (sic) or enactment; participation in an unauthorized strike; repeated failure, without satisfactory excuse, to report for work not in accordance with work schedule; stealing;

3

reporting for work while intoxicated; drinking intoxicants on Employer property/premises; insubordination, and, without construing the foregoing as words of limitation, any other similar act. (Emphasis in the original)

## ARTICLE XVII

## SICK LEAVE

C. To be eligible for benefits under this Article, an Employee who is absent due to illness or injury must notify his/her supervisor at least (4) hours before the start of his/her regularly scheduled tour of duty. Unless proper excuse is presented for the Employee's inability to call, the Employer may require proof of illness hereunder.

D. Absence of three (3) consecutive days on sick leave must be justified by a letter from the Employee's physician.

## THE POSITIONS OF THE PARTIES

### THE POSITION OF THE EMPLOYER

The Employer maintains that it has clearly met its burden of proving that it had cause to discharge the Grievant for job abandonment, and that, therefore, the grievance should be denied in its entirety.

The Employer seriously doubts that the Grievant was pregnant, and doubts whether the Grievant had the miscarriage or "incomplete abortion" that the Grievant asserts necessitated her absence from work from February 10 through March 1. The Employer emphasizes that the Grievant has never submitted a treating physician's note corroborating that the Grievant had a miscarriage, "incomplete abortion," or "D&C" that the Grievant has variously asserted occurred on February 9 and/or February 10, in a hospital or in a doctor's office. There is no medical confirmation of any such condition of the Grievant, or any such corresponding medical treatment in any hospital or doctor's office.

The Grievant wholly and deliberately failed to comply with the clear and direct rules of the Employer following her departure from work on February 9. Almost two weeks later, having abandoned her job, the Grievant submitted a completely unacceptable and insufficient note dated February 22, long after the allowed time for submitting an acceptable and sufficient doctor's note had passed.

5

The Employer asserts that the first note, dated February 22, was patently inadequate. It failed to describe the Grievant's condition with any particularity, and, in any event, the note was on a "sticky pad" and not on any doctor's letterhead stationary. It is hand-written, and states: "To whom it may concern: This is to certify that Crystal Albert hasn't been able to work since 2/9/06 because of illness. Rx recommended, advised to take rest. She may return to work from 3/01/06." (Joint 3)

Meanwhile, according to the Employer, the Grievant was thoroughly familiar with the proper procedure and time frames for submitting acceptable and adequate medical notes, having been extensively oriented for two full days. (Employer Exhibit 4) Furthermore, the Grievant did so on the prior occasion of absence due to involvement in an auto accident.

The marginally more substantive note that the Grievant subsequently submitted at the grievance meeting on June 15 remained inadequate, and, in any event, was months past the proper time for submission. The Employer denied receiving the second note, dated February 22, 2006, from the Grievant or the Union prior to the arbitration hearing. (Union 9)

The Employer asserts that the Grievant's convoluted, shifting, and thoroughly suspect and self-serving story defies bedrock common sense. If, in fact, the Grievant had suffered the condition she asserts, and if she had corresponding medical treatment, it

would have been a simple matter for the Grievant to have provided a timely and sufficient note confirming the same from a treating physician. Yet, glaringly, she has failed and refused to do so.

It is likely that the Grievant simply and cavalierly took off three weeks from work and abandoned her job. There is certainly no sufficient evidence that the Grievant was pregnant, or that she had the medical procedures performed that she asserts occurred on February 9, or that she was unable to work due to her condition or its aftermath until March 1. It is far more likely than not that the Grievant insouciantly and transparently attempted to "play the system," covering her personal frolic by falsely telling the Employer and co-workers that she was pregnant, had a miscarriage or incomplete abortion at a hospital or at her doctor's office. Manager Robertson testified at the arbitration that some employees had suggested to her that the Grievant was not really pregnant, and that she was using this lie pretextually to "play the system."

The Employer emphasizes that the Grievant's story constantly shifts, depending on her audience. At the arbitration hearing, her story changed again, this time under oath---she testified that she had a "D&C" in her doctor's office, not in a hospital.

The amalgam of the Grievant's lack of credibility and her refusal to provide an adequate doctor's note corroborating her various stories compels denial of the grievance in its entirety.

7

## THE POSITION OF THE UNION

The Union maintains that the Employer has utterly failed to meet its burden of proof. The Grievant did not abandon her job. She was pregnant, and this was well-known among her co-workers and by her supervisor, Manager Robertson.  On February 9, the Grievant became ill at work. Her cousin drove her from work to obtain medical treatment. She suffered a miscarriage/incomplete abortion. She was treated by her doctor later that same day in the doctor's office. On February 10, Supervisor Robertson called and spoke with the Grievant. As a result of her telephone call to the Grievant, Manager Robertson was made even more aware of the Grievant's medical condition and of her inability to return to work in the immediate term.

On February 22, the Grievant presented a perfectly acceptable note from her treating physician, corroborating what the Employer fully knew from the inception of this entire incident on February 9-10.  The Employer, however, summarily rejected the note as unacceptable, having already prematurely and unjustly decided to terminate the Grievant for job abandonment as a fait accompli. The Grievant presented a second note, with more detail and on the doctor's letterhead, that same day, February 22. The Employer remained obdurate, never explaining to the Grievant what sort of doctor's note would satisfy the Employer's completely subjective, indeterminate standards. Even when the Grievant presented the Employer with the more detailed doctor's notes of February

22 and June 15, the Employer remained adamant and imperially rejected the additional proferred notes.

There is no doubt that the Employer knew that the Grievant was pregnant, became ill at work on February 9, suffered a miscarriage, and was treated by her doctor on that same day. Manager Robertson, who previously was among the workers who knew the Grievant was pregnant, forthrightly testified that she spoke with the Grievant on February 10.

The Union points out that the Employer has been bizarrely fixated on the Employer's unilaterally promulgated Absenteeism policy, exalting its rigid and punitive sanctions of "job abandonment" at the expense of fundamental fairness and due process to the employees. The Union emphasizes that the Employer's "policy" is convoluted, punitive, and brittle, both as written and as applied; it is, at a minimum, deeply inconsistent with, if not diametrically opposed to, the pertinent provisions of the collective bargaining agreement. The labor contract does not compel the employee to bring in the doctor's note within three days of commencing a period of absence, with the failure to do so automatically being summary termination for purported "job abandonment." The facts here are manifestly not a case of "repeated failure" by the Grievant, per Article XI (B) of the labor contract.

Throughout its closing oral argument at the end of the arbitration hearing on November 29, the Union presented and elucidated several arbitration decisions in support of its theory of the case. (Union Exhibits 10-17)

The Union contends that the Grievant did nothing wrong, and should therefore be made whole with the grievance granted in its entirety.

## FINDINGS, ANALYSIS, AND DISCUSSION

The Employer is a non-profit institution, treating developmentally challenged clients in residential site settings. The Grievant was hired in March, 2005 as a Direct Care Counselor (Employer Exhibit 1). She worked Wednesday—Friday, 2-10:30 P.M. and Saturday and Sunday, 6 A.M.—2:30 P.M. Of the ten or so employees at the site at 235 Jerome Avenue in Brooklyn in February, 2006, the Grievant was perhaps seventh in seniority.

I find that the credible evidence, primarily through the forthright testimony of the Grievant and of her immediate Supervisor, Residence Manager Robertson, establishes that the Grievant was pregnant, that her condition was known by, inter alia, Manager Robertson and some of the Grievant's co-workers, that the Grievant became ill at work on February 9 and left work early on that date (Employer Exhibits 5-6), that her

pregnancy terminated on February 9 or 10, that she was under a doctor's care from February 9, and that Manager Robertson became aware on February 10 that the Grievant's medical condition precluded her return to work in the immediate term, when she called the Grievant by cell phone on that date. I find that Supervisor Robertson, a responsible agent of the Employer, had sufficient knowledge of the Grievant's medical condition on February 10 to vitiate the alleged "job abandonment" by the Grievant. In addition to her consistent testimony at the arbitration hearing, Manager Robertson's signed statement of February 23 to Deputy Executive Director Maria Willis expressly states, in pertinent part: "On 2/10/06 I called Ms. Albert [the Grievant] on her cellular phone and she explained that she miscarried and was in the hospital. I told her to keep in touch and that documentation was needed." (Employer Exhibit 6)

Job abandonment is a very serious charge. It brands the Grievant as completely reckless, and the sort of totally irresponsible person who would deliberately walk away from her job to indulge her own personal preferences and leave the Employer in the proverbial lurch.

The Employer's unilaterally promulgated Personnel Policy, 2nd Edition, April 15, 1998, was not negotiated with the Union. With regard to absenteeism, as the Employer's counsel expressly acknowledged at the arbitration, it is "inartfully" drafted. I find that it is inherently and deeply problematic vis-à-vis fundamental due process norms. Section 1.32, on page 9 of 30 reads, in pertinent part with regard to Absenteeism: "An employee must get prior approval for all Leave Requests. Failure to get prior approval, or in an

11

emergency situation, to properly notify your supervisor of your absence, will be considered as an unexcused/excused absence. An unexcused absence is when an employee fails to show up for work or properly notify the agency. 1st unexcused absence—counseling/verbal warning; 2nd unexcused absence—counseling with written documentation; 3rd unexcused absence—3 day suspension. An employee who has an unexcused absence for three consecutive days will be considered to have abandoned the job. This will result in the automatic termination of the worker's employment with this agency." (Employer Exhibit 2)

I find that there simply was no job abandonment. Supervisor Robertson's knowledge of the Grievant's condition on February 9 and 10 is the pivotal fact.

Admittedly, the Grievant's first note on "sticky paper," rather than on her doctor's letterhead stationary, is facially insufficient, if standing alone---at a minimum, it does not sufficiently state and explain why the Grievant was unable to work. When she was informed that the note was insufficient, however, she immediately obtained a second note from her doctor, also dated February 22, 2006, signed, and handwritten on Dr. M. Rahman, M.D.'s, letterhead stationary,  The second February 22, 2006 note (Union Exhibit 9) states: "This is to certify that Crystal Albert has not been able to work since 2/09/06 because of abdominal pain & vomiting. Rx recommendation Advised to take rest. She may return to work from 3/01/2006." (Union Exhibit 9) The June 15 third note submitted by the Grievant is virtually identical to the second note of February 22. The June 15 note is  also on the office letterhead stationary of Dr. M. Rahman, M.D., is

signed, and it states, in pertinent part: "This is to certify that Crystal Albert was seen by me on 2/22/06 because of abdominal pain and vomiting on and off for 10 days, hence wasn't able to work since 2/9/06. Rx was recommended with advise (sic) to return to work from 3/01/06."

At the arbitration hearing, the Grievant forthrightly testified that, after her cousin drove her from work when she became ill on February 9, her doctor performed a "D&C" procedure on her in the doctor's office on February 9. She testified that her doctor told her that she had suffered a miscarriage and incomplete abortion, and that the baby had had a hole in the heart. While it does not seem unduly burdensome for the Grievant's doctor to have stated the same in a letter to the Employer, it is an inconvenient and unfortunate fact that increasing numbers of doctors are refusing, for all practical purposes, to say anything of substance whatsoever in their notes to employers regarding employees under their care.

However, doctors' notes are not to be evaluated in an abstract vacuum. They must be assessed in the larger and particular context of the additional facts in each case. For example, in the present case, from at least February 10, the Employer's supervisory agent, Manager Robertson, knew, at least in general terms, of the Grievant's asserted medical circumstances. Thus, even the first doctor's note was not presented in a factual vacuum. If Manager Robertson was completely unaware of the Grievant's condition on February 9, and if she had not called the Grievant on February 10, and if the initial February 22 note was the only medical note that the Grievant ever submitted, the

13

dynamics may have been different--and the entire matter may then have presented a somewhat closer question.

I find insufficient evidence that the Employer institutionally gave the Grievant timely and clear instructions as to what further substantive, specific information it required of the Grievant's treating physician. Because of increasing concerns about patient privacy, many health care professionals are understandably reluctant to provide substantive information to employers, even when employees may be vulnerable to disciplinary/discharge actions for insufficiently detailed medical notes corroborating the employees' medical conditions and inability to work. This appears to be yet another such case, with the Grievant trapped between the Employer's legitimate right to have sufficient medical explanation as to the Grievant's medical condition[2] and the treating health care professional perhaps unduly concerned about privacy and confidentiality issues. None of the doctor's notes expressly state that the Grievant had a miscarriage, incomplete abortion, or "D&C", whether in a doctor's office or a hospital. On its face, this remains problematic.

As the Union astutely asserts, however, some timely proactivity by the Employer here could have readily dissolved the Employer's conundrum. The Employer timely could have provided the Grievant with a detailed instruction as to what further medical information the Employer required. The Employer already had the doctor's office contact

---

[2] It is axiomatic that employers have the right to timely authentic written summary and verification of the employees' medical condition and status from the employees' treating health care providers, generally signed and dated and on the physician's letterhead.  See, DISCIPLINE AND DISCHARGE IN ARBITRATION 123-124 (BNA/ABA, 1998); HOW ARBITRATION WORKS 1085 ff (BNA/ABA, 6th Ed., 2003).

information, including telephone number, in the Grievant's file from her earlier medical leave due to the car accident. (Union Exhibits 3, 4, 8)   While the original February 22 note on sticky paper is sketchy at best, neither the second note on February 22 nor the June 15 note suffer from those defects. I find insufficient evidence of any inherent unreliability and of any fundamental factual insufficiency in the second doctor's note of February 22 and in the third note of June 15. See, <u>Rollyson Aluminum Products, Inc,</u> 103 LA 588 (1994) (Union Exhibit 12).

Human Resources Manager Stewart impressed me as an official with, generally, as she expressly testified, an "open door" policy.  With regard to the Grievant's alleged "job abandonment," however, the generally "open door" at Human Resources did not swing open as readily as it might otherwise have. The Employer, including Human Resources Manager  Stewart, appears to, instead, have been driven by its formal and rigid "three day" rule[3], rather than by the real-world facts which were well known by, inter alia,  the Employer's supervisory agent, Ms. Robertson, the Grievant's immediate supervisor. If no one at work had known that the Grievant was pregnant, if the Grievant had not called or had not come into work whatsoever on February 9, if the Grievant had not become ill at work on February 9, if the Grievant had not had any communication whatsoever with Manager Robertson on February 10, and if the February 21 "sticky paper" note was the only note that the Grievant presented to the Employer, the dynamics of this case could potentially be quite different. But, the real-world circumstances

---

[3] Arbitrators generally are skeptical of rigid rules that require employees to provide medical notes prior to, or within a few days of, medically-necessitated absences and that have Draconian—e.g., job abandonment discharge---consequences difficult to square with fundamental due process. Id. at 124. See also, <u>In re Can-Clay Corporation,</u> 117 LA 1019 (2002) (Union Exhibit 13).

15

necessarily place the operation of the abstract "job abandonment" rules into a fully

informed context----a context which establishes that the Grievant did not abandon her

job.


    Although they are not formally precedential, prior labor arbitration decisions can

be appropriately influential. The Union very effectively cited and elucidated several

instructive and analogous labor arbitration decisions throughout its closing argument.

(Union Exhibits 10-17).   See, especially, <u>Mission Industries</u>, 98 LA 688 (1991) (Union

Exhibit 10)


    The Grievant testified that her unemployment compensation claim was denied,

and that she did not contest the denial. She also testified about her efforts to mitigate her

damages. She applied to several health care facilities for employment between March and

August. She has been employed by the U.S. Postal Service since August 19, working 3-

11:30 PM, with Tuesdays and Wednesdays off. On days when her health care related

employment commences about 3 P.M., when the Grievant's hours overlap with such

hours, the Grievant testified that her supervisors permit her to come into the U.S. Postal

Service facility at 5 P.M.  In mid-September, she obtained ad hoc employment at $14.65

per hour at Brookdale Hospital, working nights and on call and, in any event, no more

than thirty hours per week. On October 11, she began work at New York Presbyterian

Hospital at $15 per hour, where she works 7 A.M.—3:30 P.M., averaging four days per

week.

**AWARD**

I find that the Employer failed to meet its burden of proving job abandonment by the Grievant.

The grievance is granted.

The Grievant shall be reinstated.

The penalty shall be expunged from the Employer's and the Grievant's records.

The Grievant shall be made whole for all benefits.

The Grievant shall receive back pay, as follows: The back pay shall commence from March 1, 2006. There shall be no back pay whatsoever for the period from February 10 through February 28, the period that the Grievant was medically unable to work. The back pay award shall be offset by any unemployment compensation[4] and by the Grievant's earnings from Brookdale Hospital, Presbyterian Hospital, and any other health care-related Employer since March 1, 2006. The Grievant's earnings from the U.S. Postal

---

[4] The Grievant expressly testified at the arbitration that she did not receive unemployment compensation, that her claim had been contested by the Employer, and that she did not appeal the Employer's contestation.

17

Service, however, shall not be used in calculating the total offset from the back pay award. Her separate and independent employment with the U.S. Postal Service is unrelated to her status and employment as a health care professional, and the Grievant is entitled to all of her earnings from the U.S. Postal Service as a second, independent job, wholly apart from her work with Paul J. Cooper or any other health care provider.

By the parties' express stipulation at the close of the arbitration hearing on November 29, I retain jurisdiction in order to resolve any dispute regarding the implementation and effectuation of this Decision and Award.

DAVID L. GREGORY

I, David L. Gregory. affirm upon my oath as Arbitrator that I have executed this document as my Decision and Award in this matter on this 3rd day of December, 2006.

DAVID L. GREGORY

18